

Gary A. Davis (Trial Counsel)
Cal. Bar No. 98792
James S. Whitlock (*Admission Requested pro hac vice*)
NC Bar No. 34304
Gary A. Davis & Associates
P.O. Box 649
61 North Andrews Ave.
Hot Springs, NC 28743
(828) 622-0044

Patrick Gallagher (Cal. Bar No. 146105)
Kristin Henry (Cal. Bar No. 220908)
Sierra Club Environmental Law Program
85 Second St., 2nd Floor
San Francisco, CA 94105
(415) 977-5727

Eric E. Huber (*Admission Requested pro hac vice*)
Colo. Bar No. 40664
Douglas P. Hayes (*Admission Requested pro hac vice*)
Col. Bar No. 39216
Sierra Club Environmental Law Program
1650 38th St. Ste. 102W
Boulder, CO 80301
(303) 449-5595

ORIGINAL

FILED 2010 JUN 18 P 2:07

E-filing

**UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

JL

**SIERRA CLUB and SOUTHERN ALLIANCE FOR CLEAN ENERGY**

**Plaintiffs,**

v.

**U.S. DEFENSE ENERGY SUPPORT CENTER; KURT KUNKEL, in his official capacity as Commander of the U.S. Defense Energy Support Center; U.S.DEPARTMENT OF DEFENSE; ROBERT GATES, in his official capacity as Secretary of the Department of Defense; U.S. DEFENSE LOGISTICS AGENCY; and ALAN S. THOMPSON, in his official capacity as Director of the Defense Logistics Agency,**

**Defendants.**

CV 10 2673

Civ. No. ______________

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**STATEMENT OF THE CASE**

1. This is a lawsuit brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, et. seq., for violations of Section 526 of the Energy Independence and Security Act of 2007 ("EISA"), 42 U.S.C. § 17142, which prohibits any federal agency from entering into contracts for the purchase of fuels produced from nonconventional petroleum sources, for any mobility-related use, unless the contracts specify that the "lifecycle greenhouse gas emissions associated with the production and combustion of the fuel supplied under the contract must, on an ongoing basis, be less than or equal to such emissions from the equivalent conventional fuel produced from conventional petroleum sources." In particular, Defendant U.S. Defense Energy Support Center ("DESC") has entered into contracts on behalf of the U.S. Department of Defense to procure fuel produced from Canadian oil sands, which is a nonconventional petroleum source, and which has life cycle greenhouse gas emissions that are greater than life cycle greenhouse gas emissions from the equivalent conventional fuel produced from conventional petroleum sources. In addition, DESC has published a plan to implement its policy regarding EISA § 526 without compliance with the rulemaking requirements of the APA; and Defendants have not complied with the requirements of the National Environmental Policy Act ("NEPA") regarding the contracts or the plan.

2. The largest nonconventional petroleum source in the world is the oil sands of western Canada. Approximately 1.3 million barrels per day of petroleum are produced in the Province of Alberta alone by strip mining oil sands and separating the oil from the sands by highly energy intensive processes resulting in fuels that produce much higher life cycle greenhouse gas emissions than equivalent conventional fuels. The mining, processing, and tailings disposal also results in significant impacts to the local and regional environment.

3. The U.S. Department of Defense is by far the largest user of fuels for mobility

applications in the United States, using over 144 million barrels of petroleum products per year. The DESC is the principal purchaser of petroleum products for mobility fuels for the Department of Defense.

4. The U.S. Department of Defense currently utilizes millions of barrels per year of oil sands derived mobility fuels that are part of blends of oil sands derived fuels with fuels from conventional petroleum sources. These fuels are supplied under contracts with several refineries around the United States.

5. This case seeks declaratory judgment and preliminary and permanent injunctive relief to force Defendants to comply with Section 526 of EISA. Defendants have arbitrarily and capriciously refused to comply with Section 526 for contracts for mobility fuels that contain significant quantities of oil sands derived nonconventional fuels blended with conventional fuels.

6. This case also seeks to invalidate DESC's so-called "Interim Implementation Plan Regarding Section 526 of the Energy Independence and Security Act of 2007" ("Plan") as a rule that was adopted without the required rulemaking requirements of the APA, 5 U.S.C. § 553(b). This Plan formalizes the policy of the DESC to not comply with Section 526 for blends of oil sands derived fuels with fuels from conventional petroleum sources.

7. As set forth below, Defendants violated the APA in the following respects:

(a) by entering into contracts for the purchase of blends of oil sands derived fuels with fuels from conventional petroleum sources contrary to EISA § 526, which is in violation of 5 U.S.C. § 706(2)(A), as agency action that is arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law; (Count One)

(b) Defendant DESC violated the notice and comment rulemaking requirements of the APA, 5 U.S.C. § 553(b), by adopting the Plan without following the requirements of § 553(b); (Count Two)

(c) Defendants violated the NEPA, 42 U.S.C. § 4332(2)(C), by failing to prepare an Environmental Impact Statement prior to their decision to enter into contracts for the purchase of fuels containing Canadian oil sands derived fuels and prior to the adoption of the Plan.

JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. §§ 2201-02 (Declaratory Judgment), and 5 U.S.C. §§ 701-06 (APA).

9. An actual and justiciable controversy now exists between the parties. The Plaintiffs are now entitled to the relief herein sought to redress the harm Plaintiff is now suffering and will continue to suffer if the relief is not granted.

10. Defendants have waived sovereign immunity, pursuant to 5 U.S.C. § 702.

11. Venue is proper pursuant to 28 U.S.C. § 1391(e), because Plaintiff Sierra Club resides in this district and no real property is involved in the action. In addition, the DESC contracts for fuel to be used by the Department of Defense in the Northern District of California. For example, Hamilton Air Force Base is in the Northern District of California.

12. Assignment to the San Francisco Division of this judicial district is proper under Civil Local Rule 3-2(c)-(d) because Plaintiff Sierra Club is incorporated and headquartered in San Francisco County.

**PARTIES**

13. Plaintiff Sierra Club was founded in 1892 and is the nation's oldest grass-roots environmental organization. It is a national nonprofit organization of over 700,000 members, including a California chapter with thousands of members in California, and members in each of the states in which fuels with Canadian oil sands petroleum are and will be transported via pipeline and refined into fuels that are purchased by the Defendants. The Sierra Club's purpose is

to explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and use all lawful means to carry out these objectives. Among the Sierra Club's highest priorities is solving the pressing environmental and health problems associated with the production and combustion of fuel derived from Canadian oil sands. The Sierra Club's concerns encompass the protection of wildlands, wildlife habitat, water resources, air, climate change, public health and the health of its members, all of which stand to be affected by Defendants' failure to comply with Section 526 of the EISA.

14. Sierra Club brings this action on behalf of its members who live, work, and recreate in areas that will be affected by the deleterious impacts of increased greenhouse gas emissions resulting from the refining and end use of oil sands derived fuels, by air and/or water pollution from the pipelines, pipeline facilities, and refineries processing oil from the pipelines carrying oil sands crude oil into the United States. These members face increased risk of harm to their health, recreational, economic, and aesthetic interests as a result of Defendants failure to comply with Section 526.

15. The declaratory and injunctive relief that the Plaintiffs seek will redress the injuries to Sierra Club's members by requiring Defendants to comply with Section 526, thereby restricting the use of oil sands derived fuels by Defendants and reducing the impacts of the mining, refining and end use of these fuels, including increased greenhouse gas emissions and global warming.

16. Plaintiff Southern Alliance for Clean Energy ("SACE") is a regional organization with the mission to promote responsible energy choices that create global warming solutions and ensure clean, safe and healthy communities throughout the Southeast. To support this mission, SACE represents the interests of its members throughout the Southeast in public education,

policy advocacy, and litigation in administrative and court proceedings. SACE has a substantial number of members in coastal areas and in other areas of the Southeast that are being and will increasingly be affected by global warming.

17. SACE brings this action on behalf of its members who live, work, and recreate in areas that will be affected by the deleterious impacts of increased greenhouse gas emissions resulting from the refining and end use of oil sands derived fuels, including members of SACE who own property at or near sea level that is prone to flooding with even a small sea level rise. These members face increased risk of harm to their health, recreational, economic, and aesthetic interests as a result of Defendants failure to comply with Section 526.

18. The declaratory and injunctive relief that the Plaintiffs seek will redress the injuries to SACE's members by requiring Defendants to comply with Section 526, thereby restricting the use of oil sands derived fuels by Defendants and reducing the impacts of the mining, refining and end use of these fuels, including greenhouse gas emissions and global warming.

19. Defendant Defense Logistics Agency ("DLA") is part of the U.S. Department of Defense and is an agency of the United States government. DLA supplies almost every consumable item the U.S. military services need to operate, from groceries to jet fuel. DLA is represented in 48 states, including California. DLA includes several centers in which its activities are conducted, including the Defense Energy Support Center.

20. Defendant Defense Energy Support Center ("DESC") is part of the DLA and is an agency of the United States government. Among other energy-related missions, DESC procures petroleum-based mobility fuels for the U.S. military. DESC has offices and facilities all over the United States, including California, and supplies fuels to military bases all over the United States, including bases in California. DESC contracts for fuels for military uses directly from oil

companies at refineries throughout the United States, including refineries in Northern California at Martinez and Benicia. As the principal contracting agency for purchases of fuels for mobility-related uses by the U.S. military, DESC has the responsibility for complying with Section 526 of the EISA. Defendant Kurt Kunkel is the Director of the DESC, and as such is responsible for compliance with Section 526 of the EISA, NEPA and the APA.

21. Defendant U.S. Department of Defense is an agency of the United States government. It is charged with coordinating and supervising all agencies and functions of the government relating directly to national security and the United States armed forces. Defendant Robert Gates is the Secretary of Defense, and as such is responsible for compliance with Section 526 of the EISA, NEPA and the APA.

## STATUTORY AND REGULATORY FRAMEWORK

### Administrative Procedure Act

22. Pursuant to the APA, 5 U.S.C. §§ 551, *et seq.*, any person who has suffered legal wrong because of agency action, or who is adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

23. Pursuant to 5 U.S.C. § 706, the reviewing court shall: "(2) hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ."

24. The APA, 5 U.S.C. § 551(4), defines a rule, in pertinent part, as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . ." Prior to the application of a substantive rule, an agency must comply with the notice and comment procedures set forth in the APA. *See* 5 U.S.C. § 553(b). Failure of an agency to utilize the notice and comment rulemaking procedures of the APA renders a substantive rule void, and any action taken under the rule has

no legal effect.

25. Pursuant to 5 U.S.C. § 706, the reviewing court can invalidate agency rules that are "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

**Section 526 of the Energy Independence and Security Act of 2007**

26. The Energy Independence and Security Act of 2007 ("EISA"), 42 U.S.C. §§ 17001, *et seq.*, which became law on December 19, 2007, was established to "move the United States toward greater energy independence and security, to increase the production of clean, renewable fuels, to protect consumers, to increase the efficiency of products, buildings, and vehicles, to promote research on and deploy greenhouse gas capture and storage options, and to improve the energy performance of the Federal Government, and for other purposes." Preamble, Pub. L. 110-140 (Dec. 19, 2007).

27. Provisions of the "Carbon Neutral Government Act" were included in the EISA as enacted, including Section 526 of the EISA ("§ 526"), 42 U.S.C. § 17142, which provides that:

> No Federal agency shall enter into a contract for procurement of an alternative or synthetic fuel, including a fuel produced from nonconventional petroleum sources, for any mobility-related uses, other than for research or testing, unless the contract specifies that the lifecycle greenhouse gas emissions associated with the production and combustion the fuel supplied under the contract must, on an ongoing basis, be less than or equal to such emissions from the equivalent conventional fuel produced from conventional petroleum sources.

28. The National Aeronautics and Space Administration ("NASA") was exempted from compliance with Section 526 for certain fuel purchases in 2008 in 42 U.S.C. § 17827, as follows:

> Section 17142(a) [Section 526 of the EISA] of this title does not prohibit NASA from entering into a contract to purchase a generally available fuel that is not an alternative or synthetic fuel or predominantly produced from a nonconventional petroleum source, if--
> (1) the contract does not specifically require the contractor to provide an

> alternative or synthetic fuel or fuel from a nonconventional petroleum source;
> (2) the purpose of the contract is not to obtain an alternative or synthetic fuel or fuel from a nonconventional petroleum source; and
> (3) the contract does not provide incentives for a refinery upgrade or expansion to allow a refinery to use or increase its use of fuel from a nonconventional petroleum source.

29. No such exemption has been enacted for the Department of Defense, the DLA, or the DESC.

30. No rules have been properly adopted through APA rulemaking requirements by the Department of Defense, the DLA, or the DESC for interpretation or implementation of Section 526.

**National Environmental Policy Act**

31. "NEPA . . . makes environmental protection a part of the mandate of every federal agency and department," *Gulf Oil Corp. v. Morton,* 493 F.2d 141, 145 (9th Cir. 1973), and is the "basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a). Its purpose is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

32. To accomplish this purpose, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions *significantly* affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (emphasis added). This statement, known as an Environmental Impact Statement ("EIS"), must describe, among other items, the "environmental impact of the proposed action," any "adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

33. To determine "significance" (and thus whether an EIS must be prepared), the

agency must consider both the context and intensity of the proposed action and the degree to which the action is related to other actions with cumulatively significant impacts.

34. To help determine whether this significance threshold is met, the agency may prepare an Environmental Assessment ("EA"). Based on the EA, a federal agency either decides to prepare an EIS or makes a finding of no significant impact ("FONSI"). *See* 40 C.F.R. §§ 1501.4, 1508.9(a)(1).

35. NEPA also requires every agency to "study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources . . . ." 42 U.S.C. § 4332(2)(E). The alternatives evaluation "is the heart of the environmental impact statement." It should "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1508.9. NEPA requires that an EIS must "rigorously and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. Even if an EIS is not prepared, an EA must include a discussion of "alternatives as required by section 102(2)(E)" of NEPA. 40 C.F.R. § 1508.9(b).

36. A federal agency's NEPA analysis must include consideration of a full range of reasonably foreseeable, direct, indirect and cumulative impacts to "the natural and physical environment" (40 C.F.R. § 1508.14).

37. Cumulative impacts are impacts on the environment which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7.

## GENERAL ALLEGATIONS

**DESC Contracts for Procurement of Fuels Produced from Canadian Oil Sands**

38. The DESC is the principal purchaser of petroleum products for the U.S. military. DESC also purchases petroleum products for other federal agencies, such as the U.S. Postal Service.

39. The principal U.S. suppliers to DESC are domestic refining companies, which are located throughout the country and include a number of smaller companies as well as some very large ones. In any given year, the bulk of DESC's purchases are made from about 20 refiners, some of which own multiple refineries and supply DESC from more than one. Others own a single refinery, but it may be strategically located near one or more military installations and hence provide a key source of supply.

40. Most of the oil refined by refineries in the United States is imported from other countries. Canada is consistently the top supplier of U.S. oil imports, amounting to approximately 2.5 million barrels per day out of the 12.9 million barrels per day imported. Almost all of Canada's oil exports flow to the United States.

41. About half of Canada's oil production (about 1.3 million barrels per day) is oil sands recovered crude oil. According to the *Oil and Gas Journal*, Canada had 178 billion barrels of proven oil reserves as of January 2009, second only to Saudi Arabia. The bulk of these reserves (over 95 percent) are oil sands deposits in Alberta, which are more difficult to extract and process than conventional crude oil. Over 1 million barrels per day of oil sands recovered crude oil are imported to refineries in the United States.

42. The Canadian Association of Crude Oil Producers has projected that oil sands production will more than double within the next 5 years, by 2015, though the rate of growth would slow from there. According to the projection, by 2020, Canadian oil sands production

would be nearly three times what it is today. If most of this oil were shipped to the United States and this country continued to consume about 20 million barrels per day, Canadian oil sands recovered crude oil would represent about 15 percent of total U.S. supply.

43. According to a 2010 Report by the Cambridge Energy Research Associates, Inc., the Canadian oil sands are now poised to become the number one source of U.S. crude oil imports in 2010, surpassing crude oil imports from Saudi Arabia.

44. The main deposits of Canadian oil sands are located in Athabasca, Peace River, and Cold Lake in the Province of Alberta. About 20 percent of proven oil sands reserves in Alberta can be recovered by open pit strip mining. In open pit strip mining, truck-and-shovel operations pull away the overburden and extract the sands. Some of the world's largest shovels and trucks are used, some with payloads of 380 tons.

45. Once the sands are mined, the heavy petroleum, called bitumen, is separated from the other materials by adding hot water and caustic soda to the sand, then pumping the resulting slurry to an extraction plant where it is agitated and the oil skimmed from the top. The bitumen is then transported and eventually upgraded into synthetic crude oil.

46. In the surface mining method, about 2 tons of tar sands are required to produce one barrel (approximately 1/8 of a ton) of oil.

47. About 45 percent of Canadian oil sand recovered petroleum is recovered through *in situ* methods, which involve injecting steam or another source of heat into the oil sands formation in order to free the bitumen.

48. Oil sands bitumen must be upgraded before it can be shipped to refineries for processing into finished products. Upgrading is done by some combination of thermal conversion or coking, distillation, catalytic conversion, and hydrotreating, each of which is an energy intensive process. The end product is synthetic crude oil, which is shipped by pipeline to

refineries across North America to be refined further into jet fuels, gasoline, and other petroleum products.

49. Petroleum products derived from oil sands crude have significantly greater life cycle emissions of greenhouse gases than those from conventional oil. Production of a barrel of synthetic crude oil from Canadian oil sands produces at least three times the greenhouse gas emissions than production of conventional crude oil.

50. Canadian oil sands product is shipped from the principal producing areas by pipeline, by far the most economical method of transport. Several lines move this oil to refineries throughout Canada and the United States, and many more are planned.

51. Defendant DESC purchases approximately 100 million barrels per year of bulk fuels for use in the United States. In 2006, DESC suppliers in the U.S. included up to 27% of Canadian oil sands recovered crude oil in their production, and the percentages are likely to have increased since that time for most DESC suppliers. Therefore, a significant amount of Canadian oil sands recovered crude oil is included in the DESC purchases.

52. Contractors with DESC that supply fuel that likely contains fuel from Canadian oil sands recovered crude include, but are not limited to: BP-Husky in Lima, Ohio; BP in Whiting, Indiana; BP West in Ferndale, Washington; ChevTex in Salt Lake City, Utah; Conoco-Phillips in Ponca City, Oklahoma; ConocoPhillips in Oklahoma City, Oklahoma; ExxonMobil in Baton Rouge, Louisiana; ExxonMobil in Baton Rouge, Louisiana; Gary Williams in Wynnewood, Oklahoma; Hunt in Tuscaloosa, Alabama; Shell in Deer Park, Texas; Shell in Martinez, California; Sinclair in Sinclair, Wyoming; Tesoro in Aiea, Hawaii; United Refining in Warren, Pennsylvania; U.S. Oil Refining in Tacoma, Washington; Valero in Benicia, California; Valero in Corpus Christi, Texas; and Valero in Texas City, TX.

53. Current DESC contracts for bulk fuel purchases that are for the procurement of

fuels for mobility-related uses and that are likely to contain more than incidental amounts of Canadian oil sands recovered crude oil include, but are not limited to, those set forth below:

| **Contractor** | **Contract Identification Number(s)** | **Refinery Location(s)** |
|---|---|---|
| BP-Husky | 09-D-0464, 10-D-0477 | Lima, OH |
| BP d/b/a/ Arco | 09-D-0512 | Ferndale, WA |
| Exxon-Mobil | 09-D-0471, 10-D-0463, 10-D-0480 | Baton Rouge, LA |
| Gary Williams | 09-D-0462, 09-D-0478, 10-D-0475 | Wynnewood, OK |
| Shell | 09-D-0465, 10-D-0470 | Deer Park, TX |
| ChevronTexaco | 09-D-0499 | Salt Lake City, UT |
| Sinclair | 09-D-0503 | Sinclair, WY |
| ConocoPhillips | 09-D-0466, 10-D-0478 | Ponca City, OK<br>Oklahoma City, OK<br>Commerce City, CO<br>Wichita, KS |
| Valero | 09-D-0480, 09-D-0498, 10-D-0472 | Texas City, TX |
| Delek | 10-D-0473 | Tyler, TX |

54. These contracts do not contain the specification required by Section 526 of EISA that "the lifecycle greenhouse gas emissions associated with the production and combustion of the fuel supplied under the contract must, on an ongoing basis, be less than or equal to such emissions from the equivalent conventional fuel produced from conventional petroleum sources."

55. None of the contracts that DESC has entered since the enactment of Section 526 for fuels for mobility-related uses that include fuels derived from Canadian oil sands recovered crude have included the specification required by Section 526 of EISA that the "lifecycle

greenhouse gas emissions associated with the production and combustion of the fuel supplied under the contract must, on an ongoing basis, be less than or equal to such emissions from the equivalent conventional fuel produced from conventional petroleum sources."

**The DESC Plan Regarding Section 526 of the EISA**

56. In August 2009 DESC published the so-called "Interim Implementation Plan Regarding Section 526 of the Energy Independence and Security Act of 2007" ("Plan"). The Plan identifies actions necessary to determine whether the fuels it purchases meet the requirements of Section 526, and which contracts will be affected. Among other things, the Plan concludes "[e]ven where the amount of oil sands in the fuel could be more than incidental, such as in Canada, so long as DESC does not target or specify oil sands as the source of crude and so long as the fuels are commercially available, then these products should be considered outside the purview of Section 526."

57. This Plan and its conclusions affect the purchase of millions of barrels per year of petroleum products from privately-owned refineries throughout the United States and, in turn. affect the oil pipelines and sources of the crude oil, including Canadian oil sands producers.

58. DESC has relied upon and continues to rely upon this Plan in its contracts for purchases of fuels since August 2009.

59. In addition to increasing greenhouse gas emissions as compared to conventional fuels, the purchase of Canadian oil sands recovered crude oil fuels by Defendants results in significant effects on the environment in the United States and Canada, including destruction of streams and wetlands, contamination of ground water and surface water, air pollution from processing and refining of oils sands crude oil, and increased disposal of hazardous and solid waste.

## CLAIMS FOR RELIEF

**Count One: Defendants' Violations of EISA § 526 and APA § 706 in Contracts for Procurement of Fuel Produced from Nonconventional Petroleum Sources**

60. Plaintiffs incorporate by reference each and every other allegation in this Complaint.

61. Defendants' execution of contracts for purchase of mobility related fuels containing fuels derived from Canadian oil sands are final agency actions, pursuant to the APA, 5 U.S.C. § 706.

62. These contracts for purchase of mobility related fuels containing fuels derived from Canadian oil sands do not contain the specification required by Section 526 of the EISA.

63. Therefore, these contracts are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

**Count Two: Violation of APA § 5 U.S.C. §§ 553(b) and 706 in the DESC "Interim Implementation Plan"**

64. Plaintiffs incorporate by reference each and every other allegation in this complaint.

65. Under the APA, a "rule," is "the whole or a part of any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . ." 5 U.S.C. § 551(4). The "Interim Implementation Plan Regarding Section 526 of the Energy Independence and Security Act of 2007" is a "rule" as defined by 5 U.S.C. § 551(4).

66. When an agency "formulate[s], amend[s], or repeal[s] a rule" it must follow the APA's requirements for rulemaking, 5 U.S.C. § 551(5). These requirements include publication of the proposed rule in the *Federal Register* and an opportunity for public comments; however, the "Interim Implementation Plan Regarding Section 526 of the Energy Independence and

Security Act of 2007" was not published in the *Federal Register*, and there was not opportunity for public comments.

67. Therefore, Defendants' promulgation of and reliance on the "Interim Implementation Plan Regarding Section 526 of the Energy Independence and Security Act of 2007" is invalid for failure to comply with the rulemaking procedures of § 5 U.S.C. § 553(b); and Defendants' failure to comply with these procedures was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law contrary to 5 U.S.C. § 706(2)(A).

68. In addition, Defendants' publication of and reliance on the "Interim Implementation Plan Regarding Section 526 of the Energy Independence and Security Act of 2007" is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right in violation of Section 526 and 5 U.S.C. § 706. The Plan is inconsistent with Section 526 and has resulted and will result in violations of Section 526 by Defendants.

**Count Three: Violations of NEPA § 102(2)(E) and APA §706**

69. Plaintiffs incorporate by reference each and every other allegation in this Complaint.

70. Defendants' contracts for mobility related fuels containing Canadian oil sands recovered crude oil fuels are "major federal action[s] significantly affecting the quality of the human environment," pursuant to 42 U.S.C. § 4332(2)(C).

71. Defendants publication of and reliance on the "Interim Implementation Plan Regarding Section 526 of the Energy Independence and Security Act of 2007" is a "major federal action[s] significantly affecting the quality of the human environment," pursuant to 42 U.S.C. § 4332(2)(C).

72. Defendants have violated NEPA, 42 U.S.C. § 4332(2), and the APA's prohibition against arbitrary and capricious actions, 5 U.S.C. § 706(2)(A), by contracting for purchase of

Canadian oil sands recovered crude oil fuels without evaluating the impacts of the contracts in an EIS and by publication of and reliance on the "Interim Implementation Plan Regarding Section 526 of the Energy Independence and Security Act of 2007" without evaluating the impacts of the Plan in an EIS.

73. Plaintiffs and their members have been and will be harmed by Defendants' failure to take the requisite "hard look" at the direct, indirect, and cumulative adverse environmental effects of their decisions regarding the purchase of Canadian oil sands recovered crude oil fuels.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Honorable Court grant the following relief:

A. Declare that Defendants' contracts for purchase of mobility related fuels that contain fuels derived from Canadian oil sands recovered crude oil without the certification required by Section 526 of EISA are arbitrary and capricious, abuses of discretion, or otherwise not in accordance with law, in violation of APA § 706(2)(A).

B. Declare that Defendants' publication of and reliance on the "Interim Implementation Plan Regarding Section 526 of the Energy Independence and Security Act of 2007" are invalid because the Plan was adopted without compliance with the notice and comment requirements of the APA; and was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of APA § 706(2)(A).

C. Declare that Defendants' publication of and reliance on the "Interim Implementation Plan Regarding Section 526 of the Energy Independence and

Security Act of 2007" is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right in violation of APA § 706(2)(C).

D. Declare that Defendants violated NEPA § 102(2)(C) and APA § 706(2)(A) by not preparing and circulating an Environmental Impact Statement for public review and comment for the contracts for purchase of fuels that contain fuels derived from Canadian oil sands recovered crude oil and/or for the publication of and reliance on the "Interim Implementation Plan Regarding Section 526 of the Energy Independence and Security Act of 2007".

E. Preliminarily and permanently enjoin Defendants from entering into further contracts for purchase of mobility related fuels that contain fuels derived from Canadian oil sands without full compliance with EISA Section 526.

F. Preliminarily and permanently enjoin Defendants from applying the "Interim Implementation Plan Regarding Section 526 of the Energy Independence and Security Act of 2007" unless and until they comply with rulemaking procedures in compliance with the APA.

G. Preliminarily and permanently enjoin Defendants from entering into contracts for purchase of mobility related fuels that contain fuels derived from Canadian oil sands recovered crude oil and applying the "Interim Implementation Plan Regarding Section 526 of the Energy Independence and Security Act of 2007" unless and until they have fully complied with NEPA.

H. Award Plaintiffs their reasonable costs and attorney fees.

I. Provide such further and additional relief as the Court deems just and proper.

Respectfully submitted, this 18th day of June, 2010.

s/ ***Gary A. Davis***
Gary A. Davis (Trial Counsel)
Cal. Bar No. 98792
James S. Whitlock (*Admission Requested pro hac vice*)
NC Bar No. 34304
Gary A. Davis & Associates
P.O. Box 649
61 North Andrews Ave.
Hot Springs, NC 28743
(828) 622-0044

s/ ***Patrick Gallagher***
Patrick Gallagher
Cal. Bar No. 146105
Kristin Henry
Cal. Bar No. 220908
Sierra Club Environmental Law Program
85 Second St., 2nd Floor
San Francisco, CA 94105
(415) 977-5727

Eric E. Huber (*Admission Requested pro hac vice*)
Colo. Bar No. 40664
Douglas P. Hayes (*Admission Requested pro hac vice*)
Colo. Bar No. 39216
Sierra Club Environmental Law Program
1650 38th St. Ste. 102W
Boulder, CO 80301
(303) 449-5595